**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RANDALL THIBAULT, | 3:11-cv-00327-LRH-VPC |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| | **OF U.S. MAGISTRATE JUDGE** |
| DR. GEDNEY, *et al.*, | |
| Defendants. | April 10, 2013 |

This Report and Recommendation is made to the Honorable Larry R. Hicks, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is defendants' motion for summary judgment (#24).[1] Plaintiff did not oppose defendants' motion despite receiving two extensions of time to do so. The court has thoroughly reviewed the record and recommends that defendants' motion for summary judgment (#24) be granted.

## I.  HISTORY & PROCEDURAL BACKGROUND

Plaintiff Randall Thibault ("plaintiff"), a *pro se* litigant, was incarcerated in the custody of the Nevada Department of Corrections ("NDOC") at the time of this dispute (#5). On May 6, 2011, plaintiff filed a civil rights complaint, pursuant to 42 U.S.C. § 1983, alleging defendants Gedney and Bannister were deliberately indifferent to plaintiff's serious medical needs, in violation of the Eighth Amendment (#5, pp. 3-6). The court screened the complaint, pursuant to 28 U.S.C. § 1915A, and permitted plaintiff's Eighth Amendment claim to proceed (#4, p. 5).

---

[1] Refers to the court's docket numbers.

Plaintiff alleges the following: prior to his incarceration, three medical practitioners recommended treatment for plaintiff's hepatitis C ("HCV") (#5, p. 3). In September 2009, plaintiff's wife informed the Northern Nevada Correctional Center ("NNCC") that plaintiff had been diagnosed with HCV. *Id.* Defendant Gedney confirmed this diagnosis and told plaintiff's wife that plaintiff would be treated. *Id.* However, NNCC medical personnel failed to treat the disease. *Id.* Thereafter, plaintiff was transferred to Southern Desert Correctional Center ("SDCC"). *Id.* Plaintiff filed an inmate grievance contesting his lack of treatment, but defendant Bannister's response was "ridiculous." *Id.* at 4. Plaintiff requests $36,000 for the cost of medical treatment, accrued legal costs, and an unspecified amount of damages for "cruelly stabbing petitioner many, many [times] to take blood." *Id.* at 9.

Plaintiff attaches several unauthenticated exhibits to his complaint, including: (1) plaintiff's progress notes from a December 3, 2007, appointment with nurse practitioner Alex S. Lapasaran (#5, Ex. 1); (2) plaintiff's diagnosis from a November 20, 2007, liver biopsy by Dr. John O'Donnell (#5, Ex. 2); (3) plaintiff's inmate grievances relating to HCV (#5, Ex. 3); and (4) three incomplete unrelated articles about HCV outbreaks (#5, Ex. 4).

Defendants allege the following: in 2007, prior to plaintiff's incarceration, he was diagnosed with HCV (#5, pp. 13-16). On November 20, 2007, plaintiff underwent a liver biopsy, which indicated that his liver fibrosis had progressed to a stage one fibrosis on a scale of zero to four. *Id.* at 15. On December 3, 2007, plaintiff discussed treatment with a nurse practitioner. *Id.* at 13-14. The nurse practitioner recommended that plaintiff lose weight and abstain from consuming alcohol to improve his chances of being cured. *Id.* at 14. The nurse practitioner gave plaintiff HCV-related information and a consent form. *Id.* However, plaintiff's medical records do not indicate that any medical practitioner planned to treat plaintiff's HCV with medication. *Id.* at 13-16.

In September 2009, plaintiff was incarcerated. Even though plaintiff had been diagnosed with HCV in 2007, he had not yet begun treatment for this disease. *See id.* at 3-4. On September 15, 2009, NDOC medical providers reviewed plaintiff's infectious disease films and took his blood (#25-1, Ex. B, p. 9 (*sealed*); #25-1, Ex. D, pp. 11-12 (*sealed*)). On September 21, 2009, defendant Gedney reviewed plaintiff's laboratory results (#25-1, Ex. D, pp. 11-12 (*sealed*)). Thereafter, plaintiff received regular treatment for his other ailments, and NDOC medical providers repeatedly noted plaintiff's HCV diagnosis in his medical charts (#25-1, Ex. B (*sealed*); #25-1, Ex. C, pp. 2, 6 (*sealed*)).

On May 25, 2010, plaintiff sent a kite to the SDCC medical department requesting HCV treatment (#25-1, Ex. E (*sealed*)). On June 9, 2010, plaintiff met with an SDCC medical provider, and completed NDOC's Hepatitis C Patient Data form (#25-1, Ex. F (*sealed*)). The medical provider ordered laboratory tests and referred plaintiff to a psychiatrist to evaluate his mental capacity for HCV treatment (#25-1, Ex. B, p. 6 (sealed)). The medical provider also advised plaintiff that this was only the first step in the process of being medically approved for HCV treatment. *Id.* In June, August, and November 2010, SDCC medical personnel drew plaintiff's blood to assess his condition (#25-1, Ex. D, pp. 2-7 (*sealed*)). On December 15, 2010, SDCC medical providers informed plaintiff that defendant Gedney wished plaintiff to resubmit his request in one year because a new drug that would more effectively treat plaintiff's HCV was set to be released in 2011 (#25-1, Ex. B, p. 3 (*sealed*); #24-1, Ex. G, ¶ 13)).

Defendant Gedney declares that HCV is an extremely complex disease and the standard of care concerning its treatment is evolving (#24-1, Ex. G, ¶ 4). She states that HCV infections progress very slowly and often result in non-existent or minimal symptoms. *Id.* at ¶¶ 4-5. Blood values testing liver function and viral loads do not always provide a meaningful indication of disease

progression, as they can fluctuate over time. *Id.* The most accurate way to determine HCV progression is through a liver biopsy. *Id.* at ¶ 10. Liver fibrosis ranges from stage zero to stage four, but it can take years for a patient to progress from one stage to the next. *Id.* The ultimate concern with an HCV infection is the eventual development of cirrhosis or liver cancer. *Id.* at ¶ 5. However, the progression to end-stage liver disease can take decades, or in many patients, does not occur before the patient dies of other causes. *Id.* Because each case of HCV is different, it is not possible to examine a patient in the early stages of an HCV infection and determine if or when their disease will progress to cirrhosis. *Id.*

One of the primary drugs used to treat HCV is interferon. *Id.* at ¶ 6. Interferon must be taken as an injection and nearly all patients experience some side effects. *Id.* The most common side effect is flu-like symptoms. *Id.* Interferon can also cause emotional side effects, such as depression, which has caused NDOC to require all incarcerated patients to be cleared by a psychiatrist before treatment. *Id.* Interferon can also cause bone marrow suppression and can exacerbate underlying autoimmune processes. *Id.* While some patients only experience mild side effects, others experience significant side effects, including liver failure and even death. *Id.*

Since 1998, interferon has been used in combination with a second drug called ribavirin. *Id.* at ¶ 7. This drug combination has proven to be an effective HCV treatment for only about one-half of the patients who receive it (#24-1, Ex. G, ¶ 7; #24-1, Ex. H, ¶ 7). When this drug combination is given to patients with genotype 1a HCV (plaintiff's genotype), it has proven to be an effective HCV treatment for only about one-third of the patients who received it (#24-1, Ex. G, ¶¶ 8-9). In addition, patients with genotype 1a HCV are usually treated for forty-eight weeks instead of the usual twenty-four weeks, exposing these patients to an increased risk of significant side effects. *Id.* at ¶ 8. Because HCV treatment can produce serious side effects, and because there is no guarantee that

HCV treatment will clear the virus, NDOC does not prescribe the interferon-ribavirin drug combination for inmates with stage one fibrosis. *Id.* Outside the prison setting, the standard of care requires that medical providers consider the interferon-ribavirin drug combination when fibrosis has progressed to a stage two or higher. *Id.* Even then, medical providers must weigh the risks and benefits of treatment on a case-by-case basis. *Id.*

When defendant Gedney considered plaintiff's request for HCV treatment in 2010, she found it significant that plaintiff's 2007 liver biopsy confirmed that his liver fibrosis was at stage one at that time. *Id.* at ¶ 11. Defendant Gedney also found it significant that a new drug called boceprevir—which specifically targets genotype 1 HCV infections—was scheduled for FDA approval in May 2011. *Id.* at ¶ 12. Adding boceprevir to the interferon-ribavirin drug combination in patients with genotype 1 HCV infections increased the response rate from one-third of patients to two-thirds of patients. *Id.* Based on plaintiff's stage one fibrosis, his genotype 1a HCV infection, and the anticipated release of a new drug that would significantly increase plaintiff's chance of responding to treatment, defendant Gedney instructed SDCC medical staff to advise plaintiff to resubmit his treatment request in one year. *Id.* at ¶ 13. Defendant Gedney asserts that her decision to postpone plaintiff's HCV treatment was medically advisable, given HCV's slow progression, the serious side effects associated with treatment, and the low success rates of the interferon-ribavirin drug combination in patients with plaintiff's genotype. *Id.*

Defendant Bannister declares that his sole involvement in this case was responding to plaintiff's second level grievance (#24-1, Ex. H, ¶ 5). In plaintiff's second level grievance, he expressed frustration that he had been incarcerated for fourteen months without HCV treatment. *Id.* at ¶ 6. Defendant Bannister responded to plaintiff's grievance, as follows:

> I spoke with medical at SDCC regarding your concern and understand lab test [sic] have been drawn to evaluate your status. When and if to treat Hepatitis C, is not

> universally agreed upon by medical experts. The treatment has significant side-effects and until there is consensus opinion, it is proper to evaluate each on a case by case basis. For some hepatitis C patients, antiviral medicines may help fight off the virus and limit liver damage from the disease. These drugs don't work for all individuals with hepatitis C and the medications have serious and life-threatening side effects. Please continue to follow up with the practitioner at SDCC.

(#5, p. 19; #24-1, Ex. H, ¶¶ 8-10). Defendant Bannister states that because HCV is a very slowly progressing disease and some patients never develop symptoms, its treatment is controversial and opinions regarding treatment vary greatly among medical professionals (#24-1, Ex. H, ¶ 7). Defendant Bannister also states that at the time he considered plaintiff's grievance, plaintiff was receiving a medically acceptable course of treatment, because not every patient infected with HCV warrants immediate treatment and the prison was monitoring plaintiff's condition. *Id.* at ¶ 11.

Defendants move for summary judgment on the grounds that: (1) defendants did not act with deliberate indifference to plaintiff's serious medical needs (#24, pp. 8-9); (2) defendants cannot be sued in their official capacities (#24, p. 9); and (3) defendants are entitled to qualified immunity (#24, pp. 9-11). Defendants attach several documents to support their motion for summary judgment, including: (1) plaintiff's progress notes from NDOC (#25-1, Ex. B (*sealed*));[2] (2) plaintiff's medical orders from NDOC (#25-1, Ex. C (*sealed*));[3] (3) plaintiff's laboratory results from NDOC (#25-1, Ex. D (*sealed*));[4] (4) plaintiff's August 11, 2010, medical kite (#25-1, Ex. E (*sealed*));[5] (5) plaintiff's May 9, 2010, NDOC Hepatitis C Data form (#25-1, Ex. F (*sealed*)); (6) the declaration of Dr. Karen Gedney (#24-1, Ex. G); and (7) the declaration of Dr. Robert Bannister (#24-1, Ex. H).

---

[2] Authenticated by the declaration of Stacey Wirtz (#24-1, Ex. A, p. 2).
[3] Authenticated by the declaration of Stacey Wirtz (#24-1, Ex. A, p. 2).
[4] Authenticated by the declaration of Stacey Wirtz (#24-1, Ex. A, p. 2).
[5] Authenticated by the declaration of Stacey Wirtz (#24-1, Ex. A, p. 2).

As a preliminary matter, the court notes that plaintiff is proceeding *pro se*. "In civil cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). However, the court also notes that plaintiff has failed to oppose defendants' motion for summary judgment, despite being granted two extensions of time to do so. Local Rule 7-2(d) provides that the failure of an opposing party to file points and authorities in response to any motion shall constitute a consent to the granting of the motion.

## II. DISCUSSION & ANALYSIS

**A.  Legal Standards**

**1.  42 U.S.C. § 1983**

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert,* 526 U.S. 286, 290 (1999). Section 1983 does not offer any substantive rights, but provides procedural protections for federal rights granted elsewhere. *Albright v. Oliver,* 510 U.S. 266, 271 (1994). To prove liability under § 1983, a plaintiff must: (1) show that a person acting under color of state law engaged in some type of conduct, which (2) deprived the plaintiff of some right, privilege or immunity secured by the Constitution or federal statutory law. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overturned on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

**2.  Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where there are no factual disputes. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court will grant summary judgment if no genuine issues of material fact remain in dispute and the

moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  However, the Supreme Court has noted:

> [W]e must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citations omitted).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting authenticated evidence to demonstrate the absence of any genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Orr v. Bank of America*, 285 F.3d 764, 773-74 (9th Cir. 2002).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

On summary judgment the court is not to weigh the evidence or determine the truth of the matters asserted, but must only determine whether there is a genuine issue of material fact that must be resolved by trial.  *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).  Nonetheless, in order for any factual dispute to be genuine, there must be enough doubt for a

reasonable trier of fact to find for the plaintiff in order to defeat a defendant's summary judgment motion. *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**B.     Analysis**

   **1. Eighth Amendment Deliberate Indifference to a Serious Medical Need**

A prisoner's claim of inadequate medical care arises under the Eighth Amendment. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986). The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). To prevail in an action alleging cruel and unusual punishment, a plaintiff's case must satisfy an objective standard—that the deprivation was serious enough to amount to cruel and unusual punishment; and a subjective standard—deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Wilson v. Seiter*, 501 U.S. 294, 297-304 (1991). A prison official violates the Eighth Amendment when he responds with deliberate indifference to an inmate's serious medical needs. *Farmer*, 511 U.S. at 834.

The objective requirement of a "serious medical need" is met if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle*, 429 U.S. at 104). In this circuit, examples of serious medical needs include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citations omitted).

The subjective standard of deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835 (quoting *Whitley*, 475 U.S. at 319). The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836. To prove deliberate indifference, a plaintiff must demonstrate that prison staff denied, delayed, or intentionally interfered with medical treatment, or that the manner in which prison staff provided medical care indicated deliberate indifference; and that plaintiff sustained damages as a result of such conduct. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

Prison officials have wide discretion when determining the nature and extent of medical treatment to provide to inmates in their care. *See Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986). Prison medical staff do not violate the Eighth Amendment simply because their opinion concerning medical treatment conflicts with the opinion of the inmate-patient. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Further, a difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to a serious medical need. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). However, a prisoner may establish that such a difference of opinion amounted to deliberate indifference where "the course of treatment the doctors chose was medically unacceptable under the circumstances," and such a course of treatment was chosen "in conscious disregard of an excessive risk to the prisoner's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Plaintiff alleges that defendants Gedney and Bannister exhibited deliberate indifference to plaintiff's serious medical needs by denying HCV treatment (#5, pp. 3-5). Defendants assert that: (1) defendants were not deliberately indifferent to plaintiff's serious medical needs; (2) plaintiff's belief that he should have received HCV medication is merely a difference of opinion with the

course of treatment prescribed by NDOC doctors; (3) plaintiff cannot sue defendants in their official capacities; and (4) defendants are entitled to qualified immunity (#24, pp. 8-11).

Plaintiff's medical records reveal that plaintiff was diagnosed with HCV in 2007 (#5, pp. 3-4, 13-16). However, plaintiff did not begin treatment prior to his incarceration in 2009. *Id.* When plaintiff arrived at NNCC, medical providers reviewed his infectious disease films and took his blood (#25-1, Ex. B, p. 9 (*sealed*); #25-1, Ex. D, pp. 11-12 (*sealed*)). Defendant Gedney also reviewed plaintiff's laboratory results (#25-1, Ex. D, pp. 11-12 (*sealed*)). Thereafter, plaintiff received regular treatment for his other ailments, and NDOC medical providers repeatedly noted plaintiff's HCV diagnosis in his medical charts (#25-1, Ex. B (*sealed*); #25-1, Ex. C, pp. 2, 6 (*sealed*)).

On May 25, 2010, plaintiff requested HCV treatment (#25-1, Ex. E (*sealed*)). On June 9, 2010, plaintiff met with an SDCC medical provider and completed NDOC's Hepatitis C Patient Data form (#25-1, Ex. F (*sealed*)). The medical provider also ordered laboratory tests, referred plaintiff to a psychiatrist, and informed plaintiff that this was only the first step in the process of being medically approved for HCV treatment (#25-1, Ex. B, p. 6 (*sealed*)). In June, August, and November 2010, NDOC medical providers took plaintiff's blood to assess his condition (#25-1, Ex. D, pp. 2-7 (*sealed*)). In December 2010, defendant Gedney informed plaintiff that he was not approved for HCV treatment at that time, and advised him to resubmit his request in one year (#25-1, Ex. B, p. 3 (*sealed*); #24-1, Ex. G, ¶ 13)).

Assuming *arguendo* that plaintiff's HCV diagnosis constitutes a serious medical need, the court finds that neither defendant Gedney nor defendant Bannister exhibited deliberate indifference to plaintiff's medical condition.

First, HCV infections progress very slowly (#24-1, Ex. G, ¶¶ 4-5). In many patients, the ultimate progression to end-stage liver disease can take decades, and often does not occur before the patient dies of other causes. *Id.* at ¶ 5. The most accurate method to measure HCV progression is through a liver biopsy. *Id.* at ¶ 10. Liver fibrosis ranges from stage zero to stage four. *Id.* However, it can take years for a patient to progress from one stage to the next. *Id.* Plaintiff underwent a liver biopsy in 2007, and was diagnosed with stage one fibrosis (#5, p. 15). When plaintiff was incarcerated, NDOC medical providers did not ignore plaintiff's HCV diagnosis. Instead, the medical providers reviewed plaintiff's infectious disease films, ordered multiple laboratory tests, provided regular treatment for plaintiff's other ailments (such as hypertension), repeatedly noted plaintiff's HCV diagnosis in his medical charts, completed NDOC's Hepatitis C Patient Data form, took plaintiff's blood multiple times for further laboratory testing, and referred plaintiff to a psychiatrist to determine if he was an acceptable candidate to receive HCV medication (#25-1, Ex. B, pp. 6, 9 (*sealed*); #25-1, Ex. C, pp. 2, 6 (*sealed*); #25-1, Ex. D, pp. 2-7, 11-12 (*sealed*); #25-1, Ex. F (*sealed*)). Considering HCV's slow progression and the clear efforts the NDOC medical providers undertook to determine if plaintiff was a suitable candidate for HCV treatment, plaintiff's complaint that he was incarcerated for fourteen months without receiving HCV medication does not evidence a deliberate disregard for his medical condition.

Second, nearly all patients experienced some side effects with the interferon-ribavirin drug combination that was available in 2010 (#24-1, Ex. G, ¶ 6). These side effects include flu-like symptoms, depression, bone marrow suppression, exacerbation of autoimmune processes, liver failure, and even death. *Id.* In addition, the interferon-ribavirin drug combination was effective in only one-third of the patients with plaintiff's genotype (#24-1, Ex. G, ¶¶ 7, 9). These patients also received an extended forty-eight week medication cycle—exposing them to an increased risk of

significant side effects. *Id.* at ¶ 8. Considering the ineffectiveness of the interferon-ribavirin drug combination in patients with plaintiff's genotype, the increased risk of side effects on the forty-eight week program and plaintiff's early stage fibrosis, defendant Gedney's decision to reevaluate plaintiff's HCV status in one year was a medically reasonable determination.

Third, defendant Gedney based her decision to hold off on plaintiff's HCV treatment on the fact that a new HCV medication called boceprevir was scheduled for FDA approval in May 2011 (#24-1, Ex. G, ¶ 12). Boceprevir specifically targets genotype 1 HCV infections, and adding boceprevir to the interferon-ribavirin drug combination increased the response rate in patients with genotype 1 infections from one-third of patients to two-thirds of patients. *Id.*

Based on the HCV infection's slow progression, plaintiff's early stage fibrosis, the serious side effects associated with treatment, the low success rate of the interferon-ribavirin drug combination in patients with plaintiff's genotype and the anticipated release of a more effective drug, the court finds that defendant Gedney's decision to reevaluate plaintiff's condition in one year was medically reasonable. There is no evidence that defendant Gedney disregarded plaintiff's medical condition or that she chose a medically unacceptable course of treatment "in conscious disregard of an excessive risk" to plaintiff's health. *See Jackson*, 90 F.3d at 332. Defendant Gedney's decision to await the release of a more effective HCV medication was medically advisable under the circumstances. *See Jones*, 781 F.2d at 771 (prison officials have wide discretion in determining the nature and extent of medical treatment to provide to inmates in their care). Further, plaintiff's disagreement with defendant Gedney's medical decision does not evidence deliberate indifference on defendant Gedney's part. *See Franklin*, 662 F.2d at 1344 (prison medical staff do not violate the Eighth Amendment simply because their opinion concerning medical treatment

conflicts with the opinion of the inmate-patient). Accordingly, the court recommends that summary judgment be granted in favor of defendant Gedney.

The court also finds that defendant Bannister did not exhibit deliberate indifference to plaintiff's medical condition. Defendant Bannister's sole involvement in this case occurred in August 2010, when he responded to plaintiff's second level grievance (#24-1, Ex. H, ¶ 5). In considering plaintiff's grievance, defendant Bannister spoke with SDCC medical providers and inquired whether plaintiff was a suitable candidate for HCV treatment. *Id.* at ¶ 8. SDCC medical providers informed defendant Bannister that they had drawn plaintiff's blood and were evaluating his condition. *Id.* Defendant Bannister informed plaintiff that SDCC medical providers were evaluating his HCV condition, and advised plaintiff to follow-up with SDCC medical practitioners (#5, p. 19; #24-1, Ex. H, ¶¶ 8-10). Defendant Bannister also informed plaintiff that medical experts do not universally agree when and if to treat HCV, that the available anti-viral drugs do not work for all patients, and that HCV treatment has serious side effects. *Id.*

The court finds that defendant Bannister properly investigated plaintiff's allegations and provided an adequate response. There is no evidence that defendant Bannister acted with the subjective state of mind to deprive plaintiff of necessary care, or that he denied, delayed, or intentionally interfered with plaintiff's medical treatment. *See Hutchinson*, 838 F.2d at 394. Accordingly, the court recommends that summary judgment be granted in favor of defendant Bannister.

Plaintiff's claim that defendants Gedney and Bannister exhibited deliberate indifference to plaintiff's serious medical needs is contrary to the evidence before the court. Plaintiff has failed to demonstrate the existence of any genuine issues of material fact; and has failed to produce any evidence to suggest that defendants acted in conscious disregard of a significant risk to plaintiff's

health. Accordingly, the court recommends that defendants' motion for summary judgment (#24) be granted.[6]

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that defendants are entitled to summary judgment in their favor, as there are no genuine issues of material fact for trial. Therefore, the court recommends that defendants' motion for summary judgment (#24) be **GRANTED**. The parties are advised:

1. Pursuant to 28 U.S.C. § 636(b)(1)(c) and LR Rule IB 3-2, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

### IV. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#24) be **GRANTED**.

**DATED:** April 10, 2013.

_Valerie P. Cooke_
**UNITED STATES MAGISTRATE JUDGE**

---

[6] Because the court recommends that defendants' motion for summary judgment (#24) be granted, the court need not reach the issues of official capacity or qualified immunity.